**IN THE UNITED STATES DISTRICT COURT FOR**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| Ashland Inc. | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | Docket No. 08-227T |
| GAR Electroforming, et al. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

**MEMORANDUM IN SUPPORT OF DEFENDANT UNITED TECHNOLOGIES CORPORATION'S MOTION FOR SUMMARY JUDGMENT DISMISSING THE COMPLAINT OF PLAINTIFF ASHLAND AS UNRIPE AND BARRED BY CONTRIBUTION PROTECTION**

Pursuant to Fed. R. Civ. P. 56 and LR Cv 56, Defendant, United Technologies Corporation (UTC), moves to dismiss the complaint of Plaintiff, Ashland Inc. (Ashland), against UTC as unripe for adjudication because Ashland has failed to pay UTC for Ashland's share of the soil remedy and because Ashland may never have a claim against UTC for the groundwater remedy larger than the amount Ashland still owes UTC for the soil remedy. UTC also moves to dismiss Count III of the complaint against UTC, which purports to be for equitable indemnity, because all such claims are conclusively barred by the consent decree with the federal government and UTC, Exhibit A, which this court entered over Ashland's strenuous objections, *United States v. Davis*, 11 F.Supp.2d 183 (D.R.I. 1998), *aff'd*, 261 F.3d 1 (1st Cir. 2001), as well as by the consent decree with the Rhode Island Department of Environmental Management (RIDEM) and UTC, Exhibit B, entered by this court over Ashland's objections in 1999.

**Factual Summary**

This court has repeatedly set forth the facts related to the Davis Liquid Superfund Site in Smithfield, Rhode Island, having held two trials in the matter and many motions hearings. *United*

*States v. Davis*, 31 F.Supp.2d 45 (D.R.I. 1998); 20 F.Supp.2d 326 (D.R.I. 1998); 11 F.Supp.2d 183 (D.R.I. 1998); 1 F.Supp.2d 125 (D.R.I. 1998); 882 F.Supp. 1217 (D.R.I. 1995); 826 F.Supp. 617 (D.R.I. 1993); 794 F.Supp. 67 (D.R.I. 1992). This court's opinions on the contribution claims and entry of the consent decree with the federal government were affirmed in all material respects in 2001. *United States v. Davis*, 261 F.3d 1 (1st Cir. 2001) (*Davis Appeal*).

Since the 1998 trial, UTC has completed the soil cleanup to EPA's satisfaction and has discharged all of its obligations under the various consent decrees, including the requisite payments to the federal and state governments. EPA gave its final certification of completion to UTC in 2004, after the requisite inspections and sampling. Declaration of Philip Sheridan, UTC. ¶ 6 (attached as Exhibit C).

UTC has certified to EPA that through 2001, UTC spent approximately $23,950,000 in carrying out the work required under the federal and state consent decrees. *Id.* ¶ 4. UTC also paid EPA about $408,754 in oversight costs in February 2003. *Id.* ¶ 5. UTC collected slightly less than $3,950,000 million in contribution recoveries which it could apply against this soil cleanup work. *United States v. Davis, supra*, 31 F.Supp. at 52 n. 5 (detailing amounts owed under consent decrees later approved by this court). UTC's unrecovered expenditures for the soil cleanup and oversight costs thus total around $20,410,000 (soil remedy costs plus oversight costs minus contribution recoveries).

Under CERCLA, EPA calculates the statutory interest rate on CERCLA claims annually. Exhibit D. For the period September 30, 2001 through September 30, 2008, total statutory interest is 21.79% as shown by EPA's table of interest rates for fiscal years 2002 through 2008. For the unrecovered portion of UTC's site expenditures, about $20,410,000, this statutory interest totals about $4,350,000 for this period. Thus, UTC's remedial expenditures plus statutory interest total about $24,750,000.

Although UTC has a judgment against Ashland for 1.03% of UTC's costs at this site, Ashland has not paid UTC anything for this liability. Sheridan Declaration ¶ 7. Multiplying this percentage times the $24,750,000 in unrecovered costs and interests results shows that through September 30, 2008 Ashland owes UTC about $255,000 for Ashland's allocated share of the soil remedy.

**Argument Summary**

Under Fed. R. Civ. P. 56, judgment should be granted if there is no disputed issue of material fact and it appears that the movant is entitled to judgment as a matter of law. In this case, there is no dispute that:

- UTC conducted the prescribed soil cleanup;
- EPA certified the completion as satisfactory,
- UTC has unrecovered costs and interest of almost $25 million; and
- Ashland has paid UTC nothing for Ashland's share of the soil cleanup.

Part I of this memorandum demonstrates that Ashland, which alleges that it has spent ten times ***less*** than UTC at this site, has no claim against UTC until it extinguishes its obligation to UTC, something it cannot do through site expenditures until it has spent far more than the government's reported estimated groundwater cleanup costs of $13 million. Indeed, even if Ashland does spend $13 million for the groundwater remedy, UTC's share under this court's allocation (1.54% or about $200,000) is still considerably less than the amount currently owed by Ashland to UTC for Ashland's share of the soil cleanup, more than $250,000, a figure on which statutory interest is running. Thus, Ashland's entire case against UTC is unripe under any theory and must be dismissed. Moreover, in invoking the court's equity powers, Ashland improperly seeks to impose an inequitable burden on UTC given that UTC spent more than twenty million dollars in excess of its equitable share at this site and did so while Ashland failed to contribute anything to the soil cleanup

effort and has spent far less on its own groundwater cleanup effort. UTC expressly reserves the right to argue that it owes Ashland nothing because it would be inequitable to impose any further obligation on UTC for this site beyond what the consent decrees provided, given the very large expenditures UTC has already made.

Part II of this memorandum demonstrates that Ashland's purported equitable indemnification claim must be dismissed because it is barred, twice, by the express terms of the consent decree with the United States for the site cleanup, Exhibit A, and by the express terms of the consent decree with RIDEM, Exhibit B, both approved by this court over Ashland's objections.

## ARGUMENT

### I. The Court Should Dismiss Ashland's Claims Against UTC As Unripe Or, Alternatively, Preclude Ashland From Relitigating Liability And The Allocation Of Response Costs.

#### A. Ashland Owes UTC Money For The Soil Remedy And Has No Ripe Claim Against UTC For The Groundwater Remedy Until It Satisfies This Claim Under This Court's 1998 Equitable Allocation.

Ripeness requires the Court "to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Laboratories v. Gardner*, 87 S.Ct. 1507, 1515, 387 U.S. 136, 148 (1967). Here, Counts I (cost recovery), III (equitable indemnification), and IV (declaratory relief) of Ashland's Complaint are not ripe unless and until Ashland either pays UTC for Ashland's allocated share of the soils remedy or until Ashland incurs response costs for the groundwater remedy such that the amount UTC might owe under the Court's allocation exceeds the amount Ashland then owes UTC for Ashland's allocated share of the soil remediation. Ashland has paid UTC nothing to date. The Court therefore should dismiss these claims in their entirety. Alternatively, the Court should preclude Ashland from using these claims to relitigate the issues of liability and allocation that were fully litigated between UTC and Ashland and determined by this court and First Circuit.

Nearly ten years ago, after a 26-day bench trial, the district court ruled on UTC's claims against several non-settling parties, including Ashland, to determine an equitable contribution of liability for response costs that UTC had incurred and would incur in completing the soil remedy. *See United States v. Davis*, 31 F. Supp.2d 45 (D.R.I. 1998), *aff'd*, 261 F.3d 1 (1st Cir. 2001). This court issued a declaratory judgment holding Ashland and other defendants liable as arrangers/generators at the Davis site and allocating to each defendant a share of the total cleanup costs at the Site. *Id.* at 56, 69.

As to the allocation, this court noted that "allocation is a highly fact-intensive process that depends upon the particular circumstances of each case." *Id.* at 63 (citation omitted). Given the nature of the case, this court used the following equitable factors: (i) waste attributable to each party; (ii) each party's level of culpability; (iii) the degree of benefit each party derived from the disposal of hazardous waste; and (iv) each party's ability to pay. *Id.* at 65-66. Based on these factors, this court determined that the defendant-generators (like Ashland) bore the primary responsibility for the disposal of their hazardous substances and that they shared responsibility for the wastes they produced with the transporter of the wastes and the site owner. *Id.* at 66. Ultimately, "each generator's equitable share of liability [was] equal to the percentage of the total volume of hazardous waste deposited at the Davis Site that the particular generator produced." *Id.* at 67. As to the waste attributable to Ashland, this court, relying on extensive evidence submitted during trial, determined "that 158 drums or 8,690 gallons of Ashland's waste [were] deposited at the Davis site." *Id.* at 56. Thus, out of the total 844,275 gallons of waste disposed at the Site, the court determined that Ashland was responsible for 8,690 gallons, or 1.03%, and that UTC was responsible for 13,040 gallons, or 1.54 %. *Id.* at 67.

On appeal, Ashland challenged this court's factual findings regarding Ashland's waste volume and liability allocation. *Davis Appeal*, 261 F.3d at 32. The First Circuit analyzed the

extensive testimony and evidence presented during trial and rejected Ashland's challenge. *Id.* at 32-33. It also rejected Ashland's challenge to this court's conclusion that Ashland's waste caused or contributed to UTC's cleanup costs. *Id.* at 42-45. The First Circuit therefore affirmed the allocation of 1.03% of the site liability to Ashland, as well as the allocations for UTC and the other defendants.

EPA estimated the total cleanup costs for the Davis Site at $55 million, with an estimated $14 million for the soil cleanup, and $13 million for the groundwater cleanup. *See United States v. Davis,* 31 F. Supp. 2d at 51-52 (estimated cost of implementing cleanup plan is $49 million and EPA had incurred $6 million in enforcement costs); *Davis Appeal*, 261 F.3d at 17 (estimated cost of soil and groundwater cleanup). Under the multiple Consent Decrees between the United States, UTC, and other defendants (which did ***not*** include Ashland), *see infra* Section II, the settling parties agreed to reimburse EPA just under $15 million plus up to $440,000 in oversight costs. *Davis Appeal*, 261 F.3d at 17; *United States v. Davis, supra*, 31 F.Supp.2d. at 52 n.5 (outlining payment obligations of UTC and settling parties, after consideration of additional decrees totaling $11 million under initial decree, plus $3,946,750 in additional recoveries for the United States). In addition, UTC agreed to perform the soil cleanup and to assume the risk that the cleanup would cost more than the $14 million estimate. *Id.*

UTC completed the soil remediation in 2001 at a cost of approximately $23.95 million, Sheridan Dec. ¶ 4, about $10 million more than EPA's estimated cost. UTC also paid EPA an additional $408,753.68 in February 2003 for EPA's oversight costs. *Id.* ¶ 5. In July 2004, EPA certified the cleanup as complete in accordance with the U.S. Consent Decree. *Id.* ¶ 6. UTC recovered slightly under the $3,946,750 in contribution recoveries provided for in the additional decrees to offset some of these expenditures. *United States v. Davis, supra*, 31 F.Supp.2d at 52 n.5 (summarizing pending contribution recoveries under consent decrees later approved by the court).

Thus, in total, UTC has incurred about $20.4 million in response costs, ***plus*** statutory interest. According to EPA, statutory interest for fiscal years 2002 through 2008 totals 21.79% or more than $4,350,000 on a $20.4 million obligation through that period, so that UTC's unreimbursed expenditures plus interest total about $24,750,000. *See* http://www.epa.gov/cfo/finstatement/superfund/int_rate.htm, attached as exhibit D, setting forth the applicable CERCLA interest rates by federal fiscal year.

By virtue of the previous allocation determination, Ashland should have reimbursed UTC for 1.03% of those total costs and fees. Thus, UTC's unpaid claim against Ashland is now for more than $250,000. To date, however, Ashland has failed to pay UTC anything, Sheridan Dec. ¶ 7, leaving UTC with an outstanding, unsatisfied claim against Ashland.

Under Fed. R. Civ. P. 13(a), UTC's unsatisfied claim against Ashland is a mandatory counterclaim because it arises out of the same occurrence – implementation of the superfund remedy of the Davis site under EPA's Record of Decision (ROD) – as the claim brought by Ashland, and seeks the same kind of relief: money and a declaration of the parties' percentage share of future financial responsibility. Indeed, in *Atlantic Research* the Court stated that where one potentially responsible party sues another, settling PRP, under section 107 of CERCLA, as Ashland purports to do here, that such a counterclaim by the settling party would follow as a matter of course. *United States v. Atlantic Research*, 127 S.Ct. 2331, 2339 (2007).

Further, in contrast to the approximately $24,750,000 of unreimbursed expenditures and statutory interest that UTC has incurred, Ashland claims to have incurred $2 million for the groundwater remedy (out of the $13 million that EPA estimated it would cost). *See* Compl. ¶ 43. Obviously Ashland's incurred costs are nowhere near UTC's costs, and given Ashland's failure to reimburse UTC for Ashland's allocated share of the soil remediation, as between Ashland and UTC, Ashland has no recoverable claim against UTC, and may never have one. Thus, unless and until

Ashland has paid UTC for UTC's claim or incurred enough response costs so that its claim against UTC plainly exceeds UTC's unpaid claim against Ashland, Ashland's purported claim against UTC for reimbursement of response costs is unripe.

Under the first prong of the ripeness test, these claims are not fit for judicial resolution because they depend on facts that have not yet been developed and may not occur: namely whether Ashland will complete its groundwater cleanup and incur costs such that UTC's allocated share would exceed the amount that Ashland already owes to UTC for the soil cleanup. *See Stern v. United States District Court for the District of Massachusetts*, 214 F.3d 4, 10 (1st Cir. 2000) (fitness of issues for judicial review considers in part "the extent to which resolution of the challenge depends on facts that may not yet be sufficiently developed"). Although Ashland may seek cost recovery (as opposed to contribution) under CERCLA Section 107 against a party, like UTC, who has entered a judicially approved settlement with the United States or a State, the Supreme Court has indicated that the amount the settling party paid under the prior settlement should be considered in determining whether that party has paid more than its fair share of liability. *Atlantic Research*, 127 S.Ct. at 2339 ("A district court applying traditional rules of equity would undoubtedly consider any prior settlement as part of the liability calculus."). Here, pursuant to its settlement with the United States, UTC incurred about $24,750,000 in unreimbursed costs (including statutory interest). Under *Atlantic Research*, that amount must be considered in determining whether UTC should reimburse Ashland for any of the alleged groundwater remediation costs, which allegedly to date are only $2 million of the estimated $13 million groundwater cleanup.

Under the second prong of the ripeness test, there will be no hardship to Ashland if the Court delays consideration of this issue because right now Ashland owes UTC far more money for the soil remediation than UTC can owe Ashland under this court's earlier allocation decision. Indeed, UTC is informed that Ashland is seeking to have EPA's Record of Decision (ROD)

modified to require a less costly groundwater remedy so that Ashland does not even incur EPA's projected $13 million cost for the groundwater remedy. Thus, Ashland's claim rests on a series of contingent future events which may not come to pass, making its claim against UTC a request for an advisory opinion, which federal courts do not issue. *See, e.g., McInnis-Misenor v. Maine Medical Center*, 319 F.3d 62, 72-73 (1st Cir. 2003) (contingent future events required for claim to arise, dismissed on ripeness grounds). This court therefore should dismiss the counts against UTC -- Counts I, III, and IV -- in their entirety as to UTC and dismiss UTC from the case.

### B. Ashland is bound by this court's 1998 allocation and is precluded from relitigating that percentage allocation.

If the Court does not dismiss these Counts, however, it nonetheless should apply the doctrine of issue preclusion to bar Ashland from relitigating the issues of liability and allocation. In deciding the allocation it applied in UTC case against Ashland and other parties, this court set a very high bar to revisit that allocation:

> The facts hereby determined and the issues hereby decided will not be revisited. However, the Court retains jurisdiction for the purpose of revising this allocation if and when additional facts are discovered that were not reasonably available to the parties at the time of trial and that clearly demonstrate a change in circumstances so significant that the allocation would be rendered manifestly inequitable. In retaining jurisdiction for this purpose, the Court strongly discourages the parties from seeking to reopen this matter without a compelling reason. ***A clear showing of a material change in circumstances rendering the allocation palpably inequitable will be required.***

*United States v. Davis, supra*, 31 F.Supp.2d at 69-70 (emphasis supplied). Ashland has not alleged any material change in factual circumstances from those before the court in 1998, much less a change which would render the allocation "palpably inequitable." Ashland implicitly concedes that there are no such new factual circumstances because it did not seek leave to reopen the prior case, even though this court retained jurisdiction. Instead Ashland filed this new case.

The estimated costs of the groundwater remedy were known in 1998 and used by Ashland as a basis to object to the consent decrees, so these costs are not a material change in circumstances

from what this court already considered. Similarly, although Ashland claims that parties with large shares are "defunct or impecunious," Ashland Complaint, ¶ 36, Ashland also admits that this was so at the time of the earlier decision. *Id.*

This court specifically considered those solvency issues in 1998. *United States v. Davis, supra*, 31 F.Supp.2d at 68. Ashland was free to submit evidence on the issues of the solvency of the site owner, operator, and transporter, but did not do so. Ashland benefited by not doing so, since it wound up owing UTC for only 1.03% of the soil cleanup. Ashland is now trying to have it both ways, trying to argue on the one hand that the prior allocation is binding on UTC but that because Ashland now has to spend money on the groundwater remedy to satisfy EPA, Ashland must be relieved of that allocation, even though Ashland has spent less than a tenth of what UTC spent. In this case, revisiting the allocation for Ashland's benefit would be "palpably inequitable," not leaving the allocation alone.

As discussed above, this court and First Circuit fully considered and decided the allocation and liability issues in the previous litigation after a lengthy trial and appeal. The First Circuit has instructed that "when an issue of ultimate fact has once been determined by a valid and final judgment, the issue cannot again be litigated between the same parties in any future lawsuit." *Ramallo Bros. Printing, Inc. v. El Dia, Inc.*, 490 F.3d 86, 89 (1st Cir. 2007) (quoting *Ashe v. Swenson*, 397 U.S. 436, 443 (1970) (internal quotation marks omitted). Five elements are necessary to establish issue preclusion:

> 1. the determination . . . must be over an issue which was actually litigated in the first forum; 2. that determination must result in a valid and final judgment; 3. the determination must be essential to the judgment which is rendered by, and in, the first forum; 4. the issue before the second forum must be the same as the one in the first forum; and 5. the parties in the second action must be the same as those in the first.

*Nat'l Labor Relations Board v. Donna-Lee Sportswear Co., Inc.*, 836 F.2d 31, 34 (1st Cir. 1987); *see Hoult v. Hoult*, 157 F.3d 29, 31 (1st Cir. 1998) ("When an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim."). Each of those elements has been met here.

Ashland seeks to relitigate the same issues that it and UTC litigated in the prior case: Ashland's and UTC's liability and allocated shares. The determinations regarding liability and allocation that Ashland seek here were fully litigated by Ashland and UTC in the previous litigation, determined by this court in a final judgment that was essential to resolving that litigation, and affirmed by the First Circuit. Ashland had ample opportunity through discovery and the extensive trial to explore every aspect of it and UTC's liability, and Ashland has not alleged that the facts have changed since the prior litigation. Ashland therefore is bound by these determinations and the Court should apply the doctrine of issue preclusion to bar Ashland from using Counts I, III, and IV to revisit the prior liability and allocation determinations.

## II. The Court Should Dismiss Count III Of Ashland's Complaint Which Is Disguised As Claim For Contribution That Is Barred Under CERCLA Section 113(f)(2).

### A. Ashland's Claim for Equitable Indemnification Is, in Reality, a Claim for Contribution.

Although the Court should dismiss Ashland's entire case against UTC as unripe, *see supra* Section I, Count III should also be dismissed on an alternative ground. Ashland alleges in Count III that it is entitled to equitable indemnification from every Generator Defendant, including UTC. *See* Compl. Count III. Under First Circuit precedent, however, such a claim actually is a claim for contribution under CERCLA and should be treated accordingly, which in this case, means that it should be dismissed as to UTC.

In *United States v. Cannons Engineering Corp.*, 899 F.2d 79 (1st Cir. 1990), EPA and two states sued several non-settling parties under CERCLA. These non-settling parties asserted cross-claims against the settling parties for contribution under CERCLA and for equitable indemnification. After finding that the CERCLA contribution claims were barred by CERCLA's contribution protection for settling parties under Section 113(f)(2), 42 U.S.C. § 9613(f)(2), the First Circuit turned to the indemnity claims:

> Although CERCLA is silent regarding indemnification, we refuse to read into the statute a right to indemnification that would eviscerate § 9613(f)(2) and allow non-settlors to make an end run around the statutory scheme.
>
> Appellants allege no contractual basis for indemnification. Their noncontractual indemnity claim, by definition and extrapolation, "is in effect only a more extreme form of [a claim for] contribution." . . . Clearly, if appellants' claims for partial contribution can validly be barred in the course of implementing a CERCLA settlement, . . . their claims for total contribution, *i.e.*, indemnity, can likewise be foreclosed.

*Cannons*, 899 F.2d at 92-93 (quoting *Drake v. Raymark Indus., Inc.*, 772 F.2d 1007, 1011 n.2 (1st Cir. 1985)) (alteration in original).

Other courts, including this court, have followed this rationale. *See, e.g.*, *Branch Metal Processing, Inc. v. Boston Edison Co.*, 952 F. Supp. 893, 921 (D.R.I. 1996) (adopting magistrate's report and recommendation that relied on *Cannons* to find non-contractual indemnity claim was a disguised contribution claim under CERCLA that was barred); *Regional Airport Authority of Louisville v. LFG, LLC*, 460 F.3d 697, 711 (6th Cir. 2006) (equitable indemnity claim dismissed); *M&M Realty Co. v. Eberton Terminal Corp.*, 977 F. Supp. 683, 689 (M.D.Pa. 1997) (citing *Cannons* and other cases to find that non-contractual indemnity claim was "merely another attempt to obtain contribution" and, thus, was preempted by CERCLA); *Crown Cork & Seal Co., Inc. v. Dockery*, 907 F. Supp. 147, 151 (M.D.N.C. 1995) (finding plaintiffs' claim for non-contractual indemnity against settling parties was, "in reality, a claim for total contribution" and, thus, barred by CERCLA Section 113(f)(2)); *United*

*States v. Pretty Products, Inc.*, 780 F. Supp. 1488, 1495 (S.D. Ohio 1991) (relying on *Cannons* to find that claim for indemnity did not allege an express or implied contract and, thus, was an equitable claim that was "merely a disguised claim for contribution").

Like the non-settling parties in *Cannons*, Ashland does not allege any contractual basis for indemnification and instead relies solely on equitable principles and considerations. *See* Compl. ¶¶ 62-64. It follows, therefore, that Ashland's equitable indemnification claim, in reality, is "a more extreme form of a claim for contribution" that is foreclosed and preempted by CERCLA's contribution provisions. *Cannons*, 899 F.2d at 92 (internal quotation marks, citation and alteration omitted). Because *Cannons* has been neither overruled nor called into question by the First Circuit, it remains binding precedent and demands treatment of Ashland's equitable indemnification claim as a contribution claim against UTC that, as discussed below, should be dismissed.

### B. The Court Should Dismiss Count III Because Such Contribution Claims Are Barred By CERCLA Section 113(f)(2).

Given that Ashland's equitable indemnification claim actually is a disguised claim for contribution, the Court must dismiss this claim because UTC, as a party to two consent decrees, has contribution protection under CERCLA. CERCLA Section 113(f)(2) provides:

> A person who has resolved its liability to the United States or a State in an administrative or judicially approved settlement shall not be liable for claims for contribution regarding matters addressed in the settlement. Such settlement does not discharge any of the other potentially liable persons unless its terms so provide, but it reduces the potential liability of the others by the amount of the settlement.

42 U.S.C. § 9613(f)(2).

As discussed below, Ashland, EPA, the other parties, and the courts, all understood that the consent decrees to which UTC is a party, one with EPA and one with RIDEM, required UTC to perform the soils remedy. In exchange for this work, UTC was excused from performing the groundwater remedy ***and*** was specifically provided contribution protection against any further

claims arising from the Site. Ashland therefore should not be allowed to disguise a contribution claim as an equitable indemnification claim in an attempt to circumvent CERCLA's express statutory protections for settling parties. *See Central Illinois Public Service Co. v. Industrial Oil Tank & Line Cleaning Service*, 730 F. Supp. 1498, 1507 (W.D. Mo. 1990) ("implying an equitable right to indemnity . . . would utterly undermine the contribution protection provisions of CERCLA"). Accordingly, the Court should dismiss Count III of Ashland's complaint against UTC.

**1. UTC has contribution protection under its consent decree with the United States.**

As authorized by CERCLA Section 113(f)(2), the Consent Decree between the United States, UTC, and the first group of contribution defendants, including UTC, ("U.S. Decree") grants contribution protection for all "matters addressed." Paragraph 95 of the U.S. Decree provides that:

> The Parties agree that the Settling Defendants are entitled, as of the effective date of this Consent Decree, ***to protection from contribution action or claims as provided by CERCLA section 113(f)(2), for matters addressed in this Consent Decree***. The ***matters addressed*** in this Consent Decree are all Past Response Costs and ***all Future Response Costs, including oversight Costs, incurred and to be incurred by the United States*** as defined in Section IV (Definitions), including such costs for which the United States has been reimbursed and except as provided in Paragraphs 86 and 88 of this Consent Decree, Federal Costs of Assessment of Natural Resource Damages for Natural Resources under the trusteeship of NOAA. ***Matters addressed*** in this Consent Decree ***also are response costs incurred and to be incurred by any person or entity other than the United States for response actions related to the Site or identified in the remedy selected in the ROD as modified by the ESD.***

U.S. Decree ¶ 95 (emphasis added).

If the United States performed the groundwater remediation and recovered those costs from Ashland, Ashland is barred from suing UTC for those costs because of the first and second sentences of Paragraph 95 that protect UTC against "matters addressed," which includes "all Future

Response Costs, including oversight costs, incurred or to be incurred by the United States." The U.S. Decree defines "Future Response Costs" quite clearly with respect to groundwater remediation:

> "Future Response Costs" shall mean ***all costs paid by the United States in connection with the Site after March 31, 1996***, including, but not limited to, Oversight Costs as defined herein, ***the direct and indirect costs incurred by the United States in performing or overseeing the Management of Migration Components of the remedy set forth in the ROD***.

U.S. Decree ¶ 4, Definitions, p. 7 (emphasis added). The term "Management of Migration Components" as used in the definition of "Future Response Costs" also is defined in the Decree:

> ***The "Management of Migration Components" of the remedy set forth in the ROD shall mean*** (1) the design and construction of an alternative water supply to residents affected by contaminants migrating through the Site and off-Site in groundwater into private wells on Log Road and Burlingame Road; and ***(2) active restoration of the overburden and bedrock aquifers contaminated with volatile organic compounds ("VOCs") in accordance with the ROD.***

U.S. Decree ¶ 4, Definitions, pp. 8-9 (emphasis added).

As to any costs incurred by Ashland, rather than the United States, for groundwater remediation, Paragraph 95 of the U.S. Decree expressly includes within "matters addressed" any "response costs incurred and to be incurred ***by any person or entity other than the United States for response actions related to the Site or identified in the remedy selected in the ROD*** as modified by the ESD." U.S. Decree ¶ 95 (emphasis added). The ROD had three remedial elements – a water line (which EPA paid for and constructed), the soils remedy (which UTC performed with EPA oversight), and the groundwater pump and treat remedy (which Ashland is now dealing with "voluntarily," apparently pursuant to the threat of a unilateral administrative order ("UAO") under CERCLA Section 106). Thus, the language in Paragraph 95 clearly includes the groundwater pump and treat remedy within the definition of "matters addressed," because the groundwater remedy is set forth in the ROD. As part of "matters addressed," Paragraph 95 also includes "response costs

incurred or to be incurred . . . for response actions related to the Site," a broader catch-all than the ROD. It also would encompass the groundwater remediation.

This broad contribution protection is consistent with the language used by the First Circuit regarding the groundwater remediation in approving the Consent Decrees where the court noted that Ashland would remain liable for the groundwater remedy:

> In a case such as this, where UTC assumes an open-ended cost for soil remediation, and takes the lead in coordinating settlements and beginning the cleanup effort, the benefit of contribution protection is appropriate. Also, as UTC points out in its brief, Ashland's preoccupation with the potential of disproportionate liability "ignores the fact that UTC, which was allocated responsibility for 1.54 percent of the liability by the trial court, will perform the source control remedy, which will amount to over one-fourth of the total costs of remediating the site." UTC draws from this fact an appropriate conclusion: "This comparison shows that CERCLA can impose harsh results on PRPs; it also shows that these contribution defendants [Ashland and other non-settlors] may bear a burden roughly comparable to that of UTC."
>
> The point we made in an earlier decision remains apt: "As to the extinguished contribution claims of non-settlors or later round settlors, protection against those claims was a reasonable benefit [the settlor] acquired in exchange for settling before those others." *Charter*, 83 F.3d at 522. The result of non-settlors possibly bearing disproportionate liability for the open-ended cost of remediation is therefore consistent with the statute's paradigm, which encourages the finality of early settlement. *See Browning-Ferris*, 33 F.3d at 103.

*Davis*, 261 F.3d at 27-28.

Ashland's allegations, Comp. ¶¶ 38-39, that the U.S. Decree excludes "management of migration" components from the definition of "Remedial Action" is both irrelevant and misleading. The U.S. Decree provides:

> "Remedial Action" shall mean those activities, except for Operation and Maintenance, to be undertaken by the Settling Defendants to implement the ROD, as modified by the ESD and described in Section VI of this Consent Decree, in accordance with the SOW and the Pre-Design and Remedial Action Work Plans and other plans approved by EPA. For purposes of this Consent Decree, the term Remedial Action shall exclude the Management of Migration

> Components of the remedy as set forth in the ROD, including operation and maintenance of the Management of Migration Components, and oversight of such components.

U.S. Decree ¶ 4, p. 11.

This language simply makes clear that the settling parties were not performing the groundwater remediation. The "matters addressed" language in Paragraph 95 expressly states that the parties' contribution protection would not be limited to the soil cleanup, and the "matters addressed" provision does not use the term "remedial action" in its definition.

Consistent with the U.S. Decree's definition of "Remedial Action," other provisions also make clear that the "Management of Migration Components" is excluded from the work that UTC agreed to perform. Thus, in defining the work to be performed the groundwater work is excluded:

> ***Settling Defendants shall finance and perform the Work in accordance with this Consent Decree, the ROD (except for the Management of Migration Components set forth in the ROD)*** as modified by the ESD, the SOW, and all work plans and other plans, standards, specifications, and schedules set forth herein or developed by Settling Defendants and approved by EPA pursuant to this Consent Decree. Settling Defendants shall also reimburse the United States for Past Response Costs and Future Response Cots as provided in this Consent Decree.

U.S. Decree ¶ 6.a., p. 13 (emphasis supplied). Similar language is used elsewhere in the Decree. *Id.* ¶ 9, p. 15; ¶ 23, p. 30.

Because the U.S. Decree explicitly includes within the "matters addressed" any costs associated with the groundwater remedy, UTC has contribution protection against any further claim for those costs. Ashland's contribution claim therefore should be dismissed.

### 2. UTC also has contribution protection under the State consent decree.

UTC also settled with the State of Rhode Island to resolve potential claims for natural resource damages, which would primarily include loss of use of groundwater ("State Decree"). UTC and the other settling parties paid $2,070,000 under the State Decree and undertook additional measures to satisfy State concerns about groundwater remediation, including a requirement that there be five feet of separation between the treated soil and the water table, as well as a requirement for a groundwater modeling study. In return for these undertakings, the State Decree also granted contribution protection for the Davis Site under both CERCLA and state law:

> The Parties agree, and by entering this Consent Decree, this Court finds, that the Settling Defendants are entitled, as of the effective date of the Consent Decree, to protection form contribution action or claims as provided by CERCLA Section 113(f)(2), 42 U.S.C. § 9613(f)(2) for Covered Matters, and as provided by Rhode Island General Laws § 23-19.14 for Covered Matters. For purposes of this Paragraph, the term ***"Covered Matters" is to be construed to provide contribution protection against claims by the State or any other person (except the United States) for all matters relating to the Site. As provided in Paragraph 3 and as used in this Decree, "Covered Matters" includes, without limitation, all removal and/or remedial actions called for by the ROD, the Explanation of Significant Differences (ESD), and any amendments thereto, the Federal Consent Decree, its Appendices, and any amendments thereto, this Consent Decree, its Appendices, and any amendments thereto, the recovery of any unaddressed Past and/or Future Response Costs, Future Performance Costs, Oversight Costs, Enforcement Costs, Natural Resource Damages, and the Interest thereon.*** As used in this Decree, ***"Covered Matters" also expressly include but is not limited to***, the soil remediation work provided for in the ROD, as modified by the ESD, and supplemented by the Remedial Design Work Plant attached to the Decree, as well as ***the groundwater treatment work and alternate water supply provided for in the ROD, as that ROD may be modified from time to time, and the groundwater sampling, analysis and modeling work set forth in this Consent Decree.***

State Decree, p. 20, ¶ 17 (emphasis added).

This language expressly covers groundwater remediation of the kind Ashland is working on, both as an element of the ROD, and as "groundwater treatment work" and "groundwater sampling, analysis and modeling work." The contribution protection extends to "claims by any other person (except the United States) for all matters relating to the Site." The State Decree makes the point again in the definitions of covered matters and future performance costs, *id.*, ¶ 3, pp. 5, 6, which expressly include groundwater remediation at the Site. This structure made sense, both because it was consistent with the parallel federal consent decree, and because UTC contributed $200,000 expressly for state groundwater modeling. UTC therefore also has contribution protection under CERCLA Section 113(f)(2) by virtue of the State Decree.

**3. The First Circuit's decision in *American Cyanamid* does not save Ashland's contribution claim.**

Ashland may attempt to rely on the First Circuit's decision in *American Cyanamid Co. v. Capuano*, 381 F.3d 6 (1st Cir. 2004) ("*AmCy*") to support its contribution claim for groundwater remediation costs. That case, however, is distinguishable and does not support Ashland's claim against UTC.

In *AmCy*, the defendants argued that an earlier consent decree concerning soil cleanup also covered groundwater remediation, even though EPA had not yet decided to conduct groundwater remediation at the site. 381 F.3d at 10-11. The First Circuit, relying on its decision in the *Davis* case, rejected defendants' argument concerning the statute of limitations, finding that it was uncertain whether any such groundwater remediation would be necessary and, thus, no claim had accrued. *Id.* at 14-15. Further, the First Circuit rejected defendants' argument that they had any contribution protection against future liability for groundwater remediation. The RI/FS for groundwater remediation at the site had not been conducted at the time of the earlier settlement, so that settlement did not provide contribution protection for groundwater remediation. *Id.* at 17-18.

Thus, unlike the consent decrees here that explicitly provide contribution protection against claims regarding the groundwater remediation, the decree in *AmCy* provided no such protection.

Based on the First Circuit's decision in *Cannons*, which dictates that Ashland's equitable indemnification claim actually is a contribution claim, and the language from the U.S. and State Consent Decrees discussed above that provides UTC with contribution protection from any costs associated with the groundwater remedy, the Court should dismiss Count III against UTC for this additional reason.

*****************************************************

For the foregoing reasons, Ashland's complaint against UTC should be dismissed.

Respectfully submitted,

The Law Offices of S. Paul Ryan

/s/

S. Paul Ryan, Esq. Bar ID #2264
670 Willett Avenue
East Providence, RI 02915

Robinson & Cole LLP

/s/

James Ray, Esq.
John A. Poakeart, Esq.
695 East Main Street
Stamford, CT 06904-2305

Patton Boggs LLP

/s/

Russell V. Randle, Esq.
Michele M. Walter, Esq.
2550 M Street, NW
Washington, DC 20037
202-457-6000

Attorneys for Defendant, United Technologies Corporation

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 13th day of August, 2008, a true copy of the Memorandum In Support of Defendant United Technologies Corporation's Motion for Summary Judgment Dismissing the Complaint of Plaintiff Ashland as Unripe and Barred by Contribution Protection, Statement of Undisputed Materials Facts, Exhibits A, B, C and D was sent via electronic filing to:

Anthony F. Muri, Esq.
Muri Associates LLC
10 Weybosset Street
Providence, RI 02903-2808

David B. Graham, Esq.
Kaufman & Canoles, P.C.
P.O. Box 6000
Williamsburg, VA 23188

Counsel for Plaintiff

/s/
S. Paul Ryan, Esq.

IN THE UNITED STATES DISTRICT COURT FOR
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| Ashland Inc. | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | Docket No. 08-227T |
| GAR Electroforming, et al. | ) | |
| Defendants. | ) | |

**UNITED TECHOLOGIES CORPORATION'S STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT DISMISSING PLAINTIFF ASHLAND INC.'S COMPLAINT AS UNRIPE AND BARRED BY CONTRIBUTION PROTECTION**

1. Defendant, United Technologies Corporation (UTC), entered into a consent decree with the United States concerning the Davis Liquid Superfund Site, which this court approved in 1998 over the objections of Plaintiff, Ashland Inc. (Ashland). *United States v. Davis*, 11 F.Supp.2d 183 (D.R.I. 1998), aff'd, 261 F.3d 1 (1st Cir. 2001). Excerpts from this decree are attached for the Court's reference as Exhibit A.

2. UTC also entered into a consent decree with the Rhode Island Department of Environmental Management (RIDEM) concerning the Davis Liquid Superfund Site, which this court approved in 1999 over Ashland's objections. Ashland Complaint, ¶¶ 40, 57. Excerpts from this consent decree are attached for the Court's reference as Exhibit B.

3. These two consent decrees required UTC to carry out the soil remedy provided in the United States Environmental Protection Agency's (EPA) Record of Decision (ROD) for the Davis Liquid Superfund Site, as modified by EPA's 1996 Explanation of Significant Differences

(ESD) and by additional requirements imposed by RIDEM. Federal Decree, ¶ ¶ 6, 9; RIDEM Decree ¶ ¶ 7, 12.

4. UTC carried out the soil remedy prescribed in the decrees and substantially completed the work in 2001, followed by EPA and RIDEM inspections. Sheridan Declaration, ¶¶ 4,6, attached as Exhibit C.

5. UTC certified to EPA in UTC's report on the completion of the work that UTC had spent approximately $23,950,000 on site remediation through about the end of 2001. Sheridan Declaration, ¶ 4.

6. UTC paid EPA's oversight cost demand of $408,753.68 under the decree in February 2003. Sheridan Declaration, ¶ 5.

7. UTC recovered slightly less than $3,950,000 in contribution from settling parties in the federal consent decrees. *United States v. Davis*, 31 F.Supp. 2d 45, 52 n.5 (summarizing amounts owed under consent decrees later approved by the court). After deduction of these contribution recoveries, UTC's unrecovered remediation and oversight costs are about $20,410,000.

8. Statutory interest rates for CERCLA claims are set forth by EPA at http://www.epa.gov/cfo/finstatement/superfund/int_rate.htm, attached as Exhibit D, setting forth the applicable CERCLA interest rates by federal fiscal year. The total interest for fiscal years 2002 through 2008 is 21.79%. Multiplication of this percentage times UTC's unrecovered remediation and oversight costs totals about $4,350,000 in statutory interest.

9. This court allocated costs among the parties in its 1998 decision in United States v. Davis, 31 F.Supp. 45 (D.R.I. 1998). Ashland's share of liability under that decision is 1.03% of site costs; UTC's 1.54%. Multiplication of Ashland's percentage times UTC's unrecovered costs and

interest results in an amount owed by Ashland to UTC for soil remediation of about $255,000. To date, Ashland has paid UTC nothing for this obligation. Sheridan Declaration, ¶ 7.

Respectfully submitted,

The Law Offices of S. Paul Ryan

/s/
S. Paul Ryan, Esq. Bar ID #2264
670 Willett Avenue
East Providence, RI 02915

Robinson & Cole LLP

/s/
James Ray, Esq.
John A. Poakeart, Esq.
695 East Main Street
Stamford, CT 06904-2305

Patton Boggs LLP

/s/
Russell V. Randle, Esq.
Michele M. Walter, Esq.
2550 M Street, NW
Washington, DC 20037
202-457-6000

Attorneys for Defendant, United Technologies Corporation

**EXHIBIT A**

**Excerpts from**

**United States of America, Plaintiff**
**v.**
**William M. Davis, et al., Defendants**

**PARTIAL CONSENT DECREE RELATING TO MULTIPLE PARTIES, PERFORMANCE OF REMEDIAL WORK AND COST RECOVERY**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

UNITED STATES OF AMERICA,

Plaintiff,

v.

WILLIAM M. DAVIS, et al.,

Defendants and Third-Party Plaintiffs,

v.

AMERICAN CYANAMID COMPANY, et al.,

Third-Party Defendants and Fourth-Party Plaintiffs,

v.

ALRICH PRECISION MANUFACTURING, et al.,

Fourth-Party Defendants.

Civil Action No. 90-0484-P

PARTIAL CONSENT DECREE RELATING
TO MULTIPLE PARTIES, PERFORMANCE
OF REMEDIAL WORK AND COST RECOVERY

TABLE OF CONTENTS


| | | |
|---|---|---|
| I. | BACKGROUND | 1 |
| II. | JURISDICTION | 4 |
| III. | PARTIES BOUND | 5 |
| IV. | DEFINITIONS | 6 |
| V. | GENERAL PROVISIONS | 13 |
| VI. | PERFORMANCE OF THE WORK BY SETTLING DEFENDANTS | 15 |
| VII. | REMEDY REVIEW | 29 |
| VIII. | QUALITY ASSURANCE, SAMPLING, and DATA ANALYSIS | 31 |
| IX. | ACCESS AND INSTITUTIONAL CONTROLS | 33 |
| X. | REPORTING REQUIREMENTS | 43 |
| XI. | EPA APPROVAL OF PLANS AND OTHER SUBMISSIONS | 46 |
| XII. | PROJECT COORDINATORS | 48 |
| XIII. | ASSURANCE OF ABILITY TO COMPLETE WORK | 50 |
| XIV. | CERTIFICATION OF COMPLETION | 52 |
| XV. | EMERGENCY RESPONSE | 56 |
| XVI. | REIMBURSEMENT OF RESPONSE COSTS | 57 |
| XVII. | INDEMNIFICATION AND INSURANCE | 65 |
| XVIII. | FORCE MAJEURE | 68 |
| XIX. | DISPUTE RESOLUTION | 71 |
| XX. | STIPULATED PENALTIES | 76 |
| XXI. | COVENANTS NOT TO SUE BY PLAINTIFF | 81 |
| XXII. | COVENANTS BY SETTLING DEFENDANTS | 87 |
| XXIII. | EFFECT OF SETTLEMENT; CONTRIBUTION PROTECTION | 91 |
| XXIV. | ACCESS TO INFORMATION | 96 |
| XXV. | RETENTION OF RECORDS | 97 |

XXVI. NOTICES AND SUBMISSIONS . . . . . . . . . . . . . . . . 99

XXVII. EFFECTIVE DATE . . . . . . . . . . . . . . . . . . . 100

XXVIII. RETENTION OF JURISDICTION . . . . . . . . . . . . . . 100

XXIX. APPENDICES . . . . . . . . . . . . . . . . . . . . . 101

XXX. COMMUNITY RELATIONS . . . . . . . . . . . . . . . . . 101

XXXI. MODIFICATION . . . . . . . . . . . . . . . . . . . . 101

XXXII. LODGING AND OPPORTUNITY FOR PUBLIC COMMENT . . . . 102

XXXIII. SIGNATORIES/SERVICE . . . . . . . . . . . . . . . . . 103

XXXIV. FINAL JUDGMENT . . . . . . . . . . . . . . . . . . . . 104

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>WILLIAM M. DAVIS, at al.,<br><br>Defendants and and Third-Party Plaintiffs,<br><br>v.<br><br>AMERICAN CYANAMID COMPANY, et al.,<br><br>Third-Party Defendants and Fourth-Party Plaintiffs,<br><br>v.<br><br>ALRICH PRECISION MANUFACTURING, et al.,<br><br>Fourth-Party Defendants. | Civil Action No. 90-0484-P |

PARTIAL CONSENT DECREE RELATING
TO MULTIPLE PARTIES, PERFORMANCE
OF REMEDIAL WORK AND COST RECOVERY

I. BACKGROUND

A. The United States of America ("United States"), on behalf of the Administrator of the United States Environmental Protection Agency ("EPA"), filed a complaint in this matter pursuant to Section 107 of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9607.

Decree, each contractor and subcontractor shall be deemed to be in a contractual relationship with the Settling Defendants within the meaning of Section 107(b)(3) of CERCLA, 42 U.S.C. § 9607(b)(3). Each contractor and subcontractor, but no Settling Defendant, is deemed to be a Response Action Contractor ("RAC") for the Site as defined in Section 119(e) of CERCLA, 42 U.S.C. § 9619(e). Nothing in this Consent Decree shall be construed as an agreement to indemnify a RAC pursuant to Section 119(c) of CERCLA, 42 U.S.C. § 9619(c).

## IV. DEFINITIONS

4. Unless otherwise expressly provided herein, terms used in this Consent Decree which are defined in CERCLA or in regulations promulgated under CERCLA shall have the meaning assigned to them in CERCLA or in such regulations. Whenever terms listed below are used in this Consent Decree or in the appendices attached hereto and incorporated hereunder, the following definitions shall apply:

"CERCLA" shall mean the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. §§ 9601 et seq.

"Consent Decree" shall mean this Partial Consent Decree Relating to Multiple Parties, Performance of Remedial Work and Cost Recovery and all appendices attached hereto (listed in Section XXIX). In the event of conflict between this Consent Decree and any appendix, this Consent Decree shall control.

"Day" shall mean a calendar day unless expressly stated to be a working day. "Working day" shall mean a day other than a Saturday,

Sunday, or Federal holiday. In computing any period of time under this Consent Decree, where the last day would fall on a Saturday, Sunday, or Federal holiday, the period shall run until the close of business of the next working day.

"EPA" shall mean the United States Environmental Protection Agency and any successor departments or agencies of the United States.

"Explanation of Significant Differences" or "ESD" shall mean the EPA Explanation of Significant Differences relating to the Site signed on July 19, 1996, by the Regional Administrator, EPA Region I, or his/her delegate, and all attachments thereto. The ESD is attached as Appendix B.

"Federal Costs of Assessment of Natural Resource Damages" shall mean all costs incurred by the United States National Oceanic and Atmospheric Administration ("NOAA"), prior to the date of lodging of this Consent Decree, in assessing Natural Resource Damages at the Site.

"Future Response Costs" shall mean all costs paid by the United States in connection with the Site after March 31, 1996, including, but not limited to, Oversight Costs as defined herein, the direct and indirect costs incurred by the United States in performing or overseeing the Management of Migration Components of the remedy set forth in the ROD, the direct and indirect costs incurred by the United States in enforcing or implementing this Consent Decree, and the direct and indirect costs incurred by the United States pursuant to Sections VII (Remedy Review), IX (including, but not

limited to, attorneys fees and any monies paid to secure access and/or to implement and secure Institutional Controls, including all costs expended in negotiating, acquiring, and implementing any Institutional Controls), Paragraph 38.c (EPA modification of deficient submission) of Section XI (EPA Approval of Plans and Other Submissions), XV (Emergency Response), and Paragraph 87 (Work Takeover) of Section XXI (Covenants Not to Sue By Plaintiff). Future Response Costs include, but are not limited to, payroll costs, contractor costs, travel costs and laboratory costs.

"Institutional Controls" shall mean deed restrictions or other declarations of covenants, conditions, and restrictions and other requirements and controls developed, requested, or approved by EPA for one or more of the following purposes: (1) to restrict the use of groundwater at the Site; (2) to limit human or animal exposure to hazardous substances at the Site; (3) to ensure non-interference with the performance, operation, and maintenance of the Remedial Action and any other response actions at or pertaining to the Site; and (4) to ensure the integrity and effectiveness of the Remedial Action and any other response actions at or pertaining to the Site.

"Interest" shall mean interest at the rate specified for interest on investments of the Hazardous Substance Superfund established under Subchapter A of Chapter 98 of Title 26 of the U.S. Code, compounded on October 1 of each year, in accordance with 42 U.S.C. § 9607(a).

The "Management of Migration Components" of the remedy set forth in the ROD shall mean (1) the design and construction of an

alternative water supply to residents affected by contaminants migrating through the Site and off-Site in groundwater into private wells on Log Road and Burlingame Road; and (2) active restoration of the overburden and bedrock aquifers contaminated with volatile organic compounds ("VOCs") in accordance with the ROD.

"National Contingency Plan" or "NCP" shall mean the National Oil and Hazardous Substances Pollution Contingency Plan promulgated pursuant to Section 105 of CERCLA, 42 U.S.C. § 9605, codified at 40 C.F.R. Part 300, and any amendments thereto.

"Natural Resources" shall have the meaning provided in Section 101(16) of CERCLA, 42 U.S.C. § 9601(16).

"Natural Resource Damages" shall mean damages resulting from the release of hazardous substances at or from the Site, recoverable under Section 107 of CERCLA, 42 U.S.C. § 9607, for injury to, destruction of, or loss of Natural Resources under the trusteeship of NOAA that are located at the Site.

"Operation and Maintenance" or "O & M" shall mean all activities required to maintain the effectiveness of the Remedial Action as required under the Operation and Maintenance Plan approved or developed by EPA pursuant to this Consent Decree and the Statement of Work ("SOW").

"Oversight Costs" shall mean all direct and indirect costs that the United States incurs in reviewing plans, reports and other items pursuant to this Consent Decree, verifying the Work, or in otherwise overseeing this Consent Decree, including, but not

limited to, payroll costs, contractor costs, travel costs, and laboratory costs.

"Paragraph" shall mean a portion of this Consent Decree identified by an Arabic numeral or an upper case letter.

"Parties" shall mean the United States and the Settling Defendants.

"Past Response Costs" shall mean all costs, including, but not limited to, direct and indirect costs, that the United States paid at or in connection with the Site through March 31, 1996, plus Interest on all such costs which has accrued pursuant to 42 U.S.C. § 9607(a).

"Performance Specification Submittal" shall mean the document developed pursuant to Paragraph 11(f) of this Consent Decree and approved by EPA, and any amendments thereto.

Except in Paragraph 86(7) of this Consent Decree, "Performance Standards" shall mean the cleanup standards and other measures of achievement of the goals of the Remedial Action (other than those set forth for the Management of Migration Components), set forth in Section VI of the ROD, in the ESD, and in Section V.D of the SOW.

"Plaintiff" shall mean the United States of America.

"Pre-Design" shall mean those activities and investigations to be undertaken by the Settling Defendants pursuant to the Pre-Design Work Plan to develop the information needed for the Performance Specification Submittal and the Remedial Action.

"Pre-Design Work Plan" shall mean the document developed pursuant to Paragraphs 11(a)-(b) of this Consent Decree and approved by EPA, and any amendments thereto.

"RCRA" shall mean the Solid Waste Disposal Act, as amended, 42 U.S.C. §§ 6901 et seq. (also known as the Resource Conservation and Recovery Act).

"Record of Decision" or "ROD" shall mean the EPA Record of Decision relating to the Site signed on September 29, 1987, by the Regional Administrator, EPA Region I, or his/her delegate, and all attachments thereto. A copy of the ROD is attached as Appendix A.

"Remedial Action" shall mean those activities, except for Operation and Maintenance, to be undertaken by the Settling Defendants to implement the ROD, as modified by the ESD and described in Section VI of this Consent Decree, in accordance with the SOW and the Pre-Design and Remedial Action Work Plans and other plans approved by EPA. For purposes of this Consent Decree, the term Remedial Action shall exclude the Management of Migration Components of the remedy as set forth in the ROD, including operation and maintenance of the Management of Migration Components, and oversight of such components.

"Remedial Action Work Plan" shall mean the document developed pursuant to Paragraph 13 of this Consent Decree and approved by EPA, and any amendments thereto.

"RIDEM" shall mean the Rhode Island Department of Environmental Management and any successor departments or agencies of the State.

"Seasonal Low Groundwater Elevation" shall mean the elevation of the seasonal low water at the Site to be determined as described in Attachment B of the SOW.

"Section" shall mean a portion of this Consent Decree identified by a roman numeral.

"Settling Defendants" shall mean those Parties identified in Appendix E whose representatives have signed this Consent Decree.

"Site" shall mean the Davis Liquid Waste Superfund Site, encompassing approximately 10 acres, located between Tarkiln, Log and Burlingame Roads in the Town of Smithfield, Providence County, Rhode Island, and depicted generally on the map attached as Appendix D.

"State" shall mean the State of Rhode Island.

"Statement of Work" or "SOW" shall mean the statement of work for implementation of the Pre-Design, Performance Specification Submittal, Remedial Action, and Operation and Maintenance at the Site, as set forth in Appendix C to this Consent Decree and any modifications made in accordance with this Consent Decree.

"Supervising Contractor" shall mean the principal contractor retained by the Settling Defendants to supervise and direct the implementation of the Work under this Consent Decree.

"United States" shall mean the United States of America.

"Unsaturated Zone" shall mean the soils located between the ground surface and the Seasonal Low Groundwater Elevation at the Site to be determined as described in Attachment B of the SOW.

"Waste Material" shall mean (1) any "hazardous substance" under Section 101(14) of CERCLA, 42 U.S.C. § 9601(14); (2) any pollutant or contaminant under Section 101(33), 42 U.S.C. § 9601(33); and (3) any "solid waste" under Section 1004(27) of RCRA, 42 U.S.C. § 6903(27).

"Work" shall mean all activities Settling Defendants are required to perform under this Consent Decree, except those required by Section XXV (Retention of Records).

V. GENERAL PROVISIONS

5. Objectives of the Parties

The objectives of the Parties in entering into this Consent Decree are to protect public health or welfare or the environment at the Site by the design and implementation of response actions at the Site by the Settling Defendants, to reimburse response costs of the Plaintiff, and to resolve the claims of Plaintiff against Settling Defendants as provided in this Consent Decree.

6. Commitments by Settling Defendants

a. Settling Defendants shall finance and perform the Work in accordance with this Consent Decree, the ROD (except for the Management of Migration Components as set forth in the ROD) as modified by the ESD, the SOW, and all work plans and other plans, standards, specifications, and schedules set forth herein or developed by Settling Defendants and approved by EPA pursuant to this Consent Decree. Settling Defendants shall also reimburse the United States for Past Response Costs and Future Response Costs as provided in this Consent Decree.

b. The obligations of Settling Defendants to finance and perform the Work and to pay amounts owed the United States under this Consent Decree are joint and several. In the event of the insolvency or other failure of any one or more Settling Defendants to implement the requirements of this Consent Decree, the remaining Settling Defendants shall complete all such requirements.

7. Compliance With Applicable Law

All activities undertaken by Settling Defendants pursuant to this Consent Decree shall be performed in accordance with the requirements of all applicable federal and state laws and regulations. Settling Defendants must also comply with all applicable or relevant and appropriate requirements of all Federal and state environmental laws as set forth in the ROD and the SOW. The activities conducted pursuant to this Consent Decree, if approved by EPA, shall be considered to be consistent with the NCP.

8. Permits

a. As provided in Section 121(e) of CERCLA and Section 300.400(e) of the NCP, no permit shall be required for any portion of the Work conducted entirely on-site (i.e., within the areal extent of contamination or in very close proximity to the contamination and necessary for implementation of the Work). Where any portion of the Work that is not on-site requires a federal or state permit or approval, Settling Defendants shall submit timely and complete applications and take all other actions necessary to obtain all such permits or approvals.

b. The Settling Defendants may seek relief under the provisions of Section XVIII (Force Majeure) of this Consent Decree for any delay in the performance of the Work resulting from a failure to obtain, or a delay in obtaining, any permit required for the Work, if the Settling Defendants made a timely and complete application for such permit.

c. This Consent Decree is not, and shall not be construed to be, a permit issued pursuant to any federal or state statute or regulation.

VI. PERFORMANCE OF THE WORK BY SETTLING DEFENDANTS

9. The Settling Defendants shall perform the Work for the Site as described in this Consent Decree; the Record of Decision ("ROD") (Appendix A, hereto) (except for the Management of Migration Components) as modified by the ESD (Appendix B, hereto); the Statement of Work ("SOW") (Appendix C, hereto) (which the parties agree is consistent with and more particularly describes the Work contemplated in the ROD as modified by the ESD); and any subsequent modifications thereto. The ROD, the ESD, the SOW, and all modifications of the SOW, are hereby incorporated by reference and made a part of this Consent Decree. The Work shall be performed in accordance with all the provisions of this Consent Decree, the SOW, any modifications to the SOW, and all design specifications, Work Plans or other plans or schedules attached to or approved pursuant to the SOW. The major portions of the Remedial Action for the Site to be performed by the Settling Defendants as described in the ROD as modified by the ESD, and in the SOW, are as follows:

1. Excavation and on-site treatment by low temperature thermal desorption ("LTTD") of (1) contaminated soils in the Unsaturated Zone, (2) raw waste, and (3) Waste Material, to remove volatile organic compounds ("VOCs") and semi-volatile organic compounds ("SVOCs");

2. Testing of treated soils, raw waste, and Waste Material for the RCRA hazardous waste characteristic of toxicity using the Toxicity Characteristics Leaching Procedure ("TCLP");

3. Use of treated soils and Waste Material with concentrations below the TCLP regulatory levels to backfill excavated areas;

4. Placement of treated soils, raw waste, and Waste Material with concentrations at or above any TCLP regulatory level in a RCRA Subtitle C landfill on-site or in an off-site EPA approved facility;

5. Collection and on-site treatment, or off-site treatment and/or disposal, of contaminants volatilized by the LTTD process, and treatment, disposal or handling of surface water collected during excavation, treatment, and processing of soils, raw waste, and Waste Material;

6. Testing of Site soils prior to excavation in order to refine and further delineate the extent of contaminated soil, raw waste, and Waste Material;

7. Relocating any and all tires that need to be moved so that testing and any other Work required by this Consent Decree can be performed;

8. Locating drums or other containerized Waste Material at the Site, and shredding and treating such Waste Material on-Site or removing such drums or Waste Material off-Site for treatment and/or disposal at an EPA-approved facility;

9. Restoring excavated areas and other areas of the Site, including any wetlands, disturbed during the course of the Work;

10. Post-excavation testing, and additional excavation and treatment as necessary, of the Site soils in order to ensure that all soils in the Unsaturated Zone at the Site meet the Performance Standards set forth in the ROD, the ESD and the SOW;

11. Submitting and implementing an operation and maintenance plan if it is determined by EPA that such O & M is necessary; and

12. Submitting and implementing each of the deliverables required by the SOW and this Consent Decree.

10. Selection of Supervising Contractor.

a. All aspects of the Work to be performed by Settling Defendants pursuant to Sections VI (Performance of the Work by Settling Defendants), VII (Remedy Review), VIII (Quality Assurance, Sampling and Data Analysis), and XV (Emergency Response) of this Consent Decree shall be under the direction and supervision of the Supervising Contractor. The Settling Defendants have proposed Environmental Safety and Designs, Inc. as the Supervising Contractor. EPA will issue a notice of disapproval or an authorization to proceed. If at any time thereafter, Settling Defendants propose to change a Supervising Contractor, Settling

contained therein. The Settling Defendants shall submit to EPA and the State all plans, submittals, or other deliverables required under the approved Remedial Action Work Plan in accordance with the approved schedule for review and approval pursuant to Section XI (EPA Approval of Plans and Other Submissions). As provided in the schedule included in the EPA-approved Remedial Action Work Plan, Settling Defendants shall conduct a Pre-Construction Conference, which shall be attended by the Settling Defendants' Remedial Action Project Team, the QA Official, and representatives of EPA and the State. Unless otherwise directed by EPA, Settling Defendants shall not commence construction of the Remedial Action at the Site prior to approval of the Remedial Action Work Plan.

14. Within 10 days after the Pre-Construction Conference, the Settling Defendants shall commence construction of the Remedial Action at the Site.

15. The Settling Defendants shall continue to implement the Remedial Action and, if necessary, O & M until the Performance Standards set forth in Paragraph 16, below, are achieved and for so long thereafter as is otherwise required under this Consent Decree.

16. Performance Standards. Settling Defendants shall achieve soil cleanup as set forth in the ROD, as modified by the ESD, and the SOW. The ROD provides a Soil Cleanup Level for total volatile organic compounds ("VOCs") to below 2 parts per million ("ppm"). Sampling and analysis of soils at the Site in accordance with the SOW ("Confirmation Samples") shall be used as a basis to demonstrate that the Soil Cleanup Level has been achieved at the

Site. As provided in the ROD as modified by the ESD, and as provided more particularly in the SOW, the point of compliance for the soils, consistent with the NCP, shall be throughout all contaminated soils in the Unsaturated Zone at the Site. If one or more of the Confirmation Samples contains 2 ppm or more of total VOCs, Settling Defendants shall, pursuant to the procedures set forth in the SOW and EPA-approved work plans implementing the SOW, continue to excavate and treat soil, and then to collect and analyze additional Confirmation Samples, until Confirmation Samples show that Site soils meet the Performance Standard.

17. Settling Defendants acknowledge and agree that nothing in this Consent Decree, the SOW, the Pre-Design or Remedial Action Work Plans, or Performance Specification Submittal constitutes a warranty or representation of any kind by Plaintiff that compliance with the work requirements set forth in the SOW and the Work Plans will achieve the Performance Standards.

18. Settling Defendants shall comply with Procedures for Planning and Implementing Off-Site Response Actions, 58 Fed. Reg. 49215-18 (Sept. 22, 1993) (codified at 40 C.F.R. § 300.440), and amendments thereto. Prior to any off-Site shipment of Waste Material from the Site to an out-of-state waste management facility by, on behalf of, or pursuant to an agreement with, Settling Defendants, Settling Defendants shall provide written notification to the appropriate state environmental official in the receiving facility's state and to the EPA Project Coordinator of such shipment of Waste Material.

23. Settling Defendants' Obligation To Perform Further Response Actions. If EPA selects further response actions for the Site, the Settling Defendants shall undertake such further response actions (except for Management of Migration Components) to the extent that the reopener conditions in Paragraph 83 or Paragraph 84 (United States' reservations of liability based on unknown conditions or new information) are satisfied. Settling Defendants may invoke the procedures set forth in Section XIX (Dispute Resolution) to dispute (1) EPA's determination that the reopener conditions of Paragraph 83 or Paragraph 84 of Section XXI (Covenants Not To Sue by Plaintiff[s]) are satisfied, (2) EPA's determination that the Remedial Action together with the actions taken or to be taken under the Management of Migration Components of the remedy set forth in the ROD as modified by the ESD are not protective of human health and the environment, or (3) EPA's selection of the further response actions. Disputes pertaining to whether the Remedial Action together with the actions taken or to be taken under the Management of Migration Components of the remedy set forth in the ROD as modified by the ESD are protective or to EPA's selection of further response actions shall be resolved pursuant to Paragraph 68 (record review).

24. Submissions of Plans. If Settling Defendants are required to perform the further response actions pursuant to Paragraph 23, they shall submit a plan for such work to EPA for approval in accordance with the procedures set forth in Section VI (Performance

50. Settling Defendants may change the form of financial assurance provided under this Section at any time, upon notice to and approval by EPA, provided that the new form of assurance meets the requirements of this Section. In the event of a dispute, Settling Defendants may change the form of the financial assurance only in accordance with the final administrative or judicial decision resolving the dispute.

## XIV. CERTIFICATION OF COMPLETION

51. Completion of the Remedial Action

a. Within 30 days after Settling Defendants conclude that the Remedial Action has been fully performed and the Performance Standards have been attained, Settling Defendants shall schedule and conduct a pre-final inspection to be attended by Settling Defendants, EPA, the State, and their designated representatives. If, after the pre-final inspection, the Settling Defendants still believe that the Remedial Action has been fully performed and the Performance Standards have been attained, they shall submit a written report requesting certification to EPA for approval, with a copy to the State, pursuant to Section XI (EPA Approval of Plans and Other Submissions) within 30 days of the inspection. In the report, a registered professional engineer and the Settling Defendants' Project Coordinator shall state that the Remedial Action has been completed in full satisfaction of the requirements of this Consent Decree. The written report shall document that all Remedial Action activities are complete, and that Performance Standards have been met, and shall include, but not be limited to:

(1) a description of the chronology of the work; (2) discussion of the disposal of any process waste or residuals from treatment; (3) discussion of air monitoring and treatment process monitoring; (4) tabulation of all analytical data and field notes prepared during the course of the Remedial Action; (5) a description, with maps, photos, and tables, of the conditions at the Site including areas and volumes of soil placement and disturbance; and (6) to the extent deemed necessary by EPA, as-built drawings signed and stamped by a professional engineer. The report shall contain the following statement, signed by a responsible corporate official of a Settling Defendant or the Settling Defendants' Project Coordinator:

> "To the best of my knowledge, after thorough investigation, I certify that the information contained in or accompanying this submission is true, accurate and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations."

If, after completion of the pre-final inspection and receipt and review of the written report, EPA determines that the Remedial Action or any portion thereof has not been completed in accordance with this Consent Decree or that the Performance Standards have not been achieved, EPA will notify Settling Defendants in writing of the activities that must be undertaken by Settling Defendants pursuant to this Consent Decree to complete the Remedial Action and achieve the Performance Standards. Provided, however, that EPA may only require Settling Defendants to perform such activities pursuant to this Paragraph to the extent that such activities are consistent with the "scope of the remedy selected in the ROD as

modified by the ESD," as that term is defined in Paragraph 19(b). EPA will set forth in the notice a schedule for performance of such activities consistent with the Consent Decree and the SOW or require the Settling Defendants to submit a schedule to EPA for approval pursuant to Section XI (EPA Approval of Plans and Other Submissions). Settling Defendants shall perform all activities described in the notice in accordance with the specifications and schedules established pursuant to this Paragraph, subject to their right to invoke the dispute resolution procedures set forth in Section XIX (Dispute Resolution).

b. If EPA concludes, based on the pre-final inspection and the initial or any subsequent report requesting Certification of Completion and after a reasonable opportunity for review and comment by the State, that the Remedial Action has been performed in accordance with this Consent Decree and that the Performance Standards have been achieved, EPA will so certify in writing to Settling Defendants. Certification of Completion of the Remedial Action shall not affect Settling Defendants' other obligations under this Consent Decree.

52. <u>Completion of the Work</u>

a. Within 90 days after Settling Defendants conclude that all phases of the Work (including O & M, if necessary), have been fully performed, Settling Defendants shall schedule and conduct a pre-certification inspection to be attended by Settling Defendants, EPA, the State, and their designated representatives. If, after the pre-certification inspection, the Settling Defendants still

the SOW. In the event that Settling Defendants fail to take appropriate response action as required by this Section, and EPA takes such action instead, Settling Defendants shall reimburse EPA all costs of the response action not inconsistent with the NCP as Future Response Costs (but not as Oversight Costs) pursuant to Section XVI (Reimbursement of Response Costs).

54. Nothing in the preceding Paragraph or in this Consent Decree shall be deemed to limit any authority of the United States a) to take all appropriate action to protect human health and the environment or to prevent, abate, respond to, or minimize an actual or threatened release of Waste Material on, at, or from the Site, or b) to direct or order such action, or seek an order from the Court, to protect human health and the environment or to prevent, abate, respond to, or minimize an actual or threatened release of Waste Material on, at, or from the Site, subject to Section XXI (Covenants Not to Sue by Plaintiff).

XVI. REIMBURSEMENT OF RESPONSE COSTS

55. a. In reimbursement of Past Response Costs and Future Response Costs (except for Future Response Costs to be paid in accordance with Paragraph 56 of this Consent Decree), Settling Defendants shall pay to the EPA Hazardous Substance Superfund the sum of Eleven Million Dollars ($11,000,000.00) plus Interest (as defined in Paragraph 4 of this Consent Decree) on that sum accrued from September 1, 1996, through the date of payment. Such payment shall be made as described in Subparagraphs (b) through (f) of this Paragraph 55.

b. Within 15 days of the date of lodging of this Consent Decree, Settling Defendants shall establish an escrow account ("Escrow Account") bearing interest on commercially reasonable terms in a federally chartered bank doing business in the State of Rhode Island, and on that date shall pay into the Escrow Account the sum of Eleven Million Dollars ($11,000,000.00) plus Interest accrued on that sum from September 1, 1996, through the date of the payment of the required sums into the Escrow Account. The escrow agent and the terms of the escrow agreement shall be subject to prior approval by the United States. The escrow agreement between the Settling Defendants and the escrow agent shall provide that the escrow agent shall submit to the jurisdiction and venue of the United States District Court for the District of Rhode Island in connection with any litigation arising out of the escrow agreement. The Settling Defendants shall notify the United States in writing of the creation and funding of the Escrow Account within three business days after the payment into the Escrow Account has been made. The Settling Defendants shall pay all fees, costs, taxes and charges related to the Escrow Account, and those amounts will not be deducted from the principal or interest owed from the Escrow Account to the United States. Should the Settling Defendants fail to timely fund the Escrow Account, the United States may withdraw its consent to this Consent Decree.

c. All funds paid into the Escrow Account by the Settling Defendants shall remain in the Escrow Account and may not be withdrawn by any person, except to make the payment required by

Subparagraphs 55(a) and (d), or unless one of the following events occurs: (1) the United States withdraws its consent to the entry of this Consent Decree after the Consent Decree has been lodged, Section XXXII (Lodging and Opportunity for Public Comment); or (2) a final judicial determination is made that the Consent Decree will not be approved and entered in the form signed by the Parties. If one of these events occurs, all sums in the Escrow Account, including interest, shall be returned to the Settling Defendants.

d. Within five (5) days after the period for filing an appeal has run following approval and entry of this Consent Decree in the form signed by the Parties if no appeal is filed; or, if an appeal to entry of the Consent Decree is filed, within five (5) days after a final decision on all appeals affirming the District Court's entry of the Consent Decree in the form signed by the Parties, the Settling Defendants shall cause the full principal amount of $11,000,000.00, paid into the Escrow Account pursuant to Subparagraph 55(b), plus all interest accrued on this amount, to be disbursed from the Escrow Account to the United States in the manner described in Subparagraph 55(f) below.

e. If the balance in the Escrow Account on the date of payment is less than the sum of $11,000,000.00 plus Interest (as defined in Paragraph 4 of this Consent Decree) accrued from September 1, 1996 through the date of payment, Settling Defendants on the date of payment shall make an additional payment to the United States of the difference. Such additional payment shall be made in the manner described in Subparagraph 55(f), below.

f. The payments required by Subparagraphs 55(a) through 55(e) of this Consent Decree shall be made by FedWire Electronic Funds Transfer ("EFT" or wire transfer) to the U.S. Department of Justice account in accordance with current electronic funds transfer procedures, referencing the appropriate U.S.A.O. file number, EPA Region and Site/Spill ID # 0117, Davis Liquid Waste Site Special Account, and DOJ case number 90-11-2-137B. Payment shall be made in accordance with instructions provided to the Settling Defendants by the Financial Litigation Unit of the United States Attorney's Office for the District of Rhode Island following lodging of the Consent Decree. Any payments received by the Department of Justice after 4:00 P.M. (Eastern Time) will be credited on the next business day. Settling Defendants shall send notice that such payment has been made to the United States as specified in Section XXVI (Notices and Submissions), and to Chief, Search and Cost Recovery Office, U.S. E.P.A. (HBS), J.F.K. Federal Building, Boston, Massachusetts 02203.

g. Within one year of the effective date of this Consent Decree, Settling Defendants shall pay to the EPA Hazardous Substance Superfund by check the principal amount of $2,500,000.00, plus Interest computed on the principal amount accruing from September 1, 1996, in further reimbursement of Past Response Costs and Future Response Costs (except for Future Response Costs to be paid in accordance with Paragraph 56 of this Consent Decree), and shall give notice to the United States and EPA, in the manner described in Subparagraph 56(a) of this Consent Decree. The

principal amount to be paid pursuant to this Subparagraph shall be reduced by the amount of any payments made to the United States in accordance with Paragraph 99(b) of this Consent Decree. Interest will be computed thereafter on the unpaid balance of the principal amount and accrued interest which remains unpaid. This Subparagraph shall not be construed to require a payment by the United States to Settling Defendants in the event the United States recovers more than $2,500,000.00 in accordance with Paragraph 99.

h. Of the amounts to be paid to the United States pursuant to Paragraph 55, 49% shall be deposited in the EPA Hazardous Substances Superfund as reimbursement for Past Response Costs incurred at or in connection with the Site. The remainder (51%) shall be deposited in the Davis Liquid Waste Site Special Account to be retained and used to conduct or finance response action or activities at or in connection with the Site, but not any response action or activities undertaken by Settling Defendants pursuant to this Consent Decree. All payments of Future Response Costs made pursuant to Paragraph 56 shall be deposited in the Davis Liquid Waste Site Special Account to be retained and used to conduct or finance response actions or activities at or in connection with the Site, but not any response action or activities undertaken by Settling Defendants pursuant to this Consent Decree. Any balance remaining in the Davis Liquid Waste Site Special Account after completion of all response action at or in connection with the Site shall be deposited in the EPA Hazardous Substance Superfund.

56. a. Settling Defendants shall reimburse the EPA Hazardous Substance Superfund for all Future Response Costs, including Oversight Costs, not inconsistent with the National Contingency Plan, plus Interest thereon computed in accordance with Subparagraph (e) of this Paragraph. The United States will send Settling Defendants a bill requiring payment that includes a Region I standard cost summary, which is a line-item summary of costs in dollars by category of costs (included but not limited to payroll, travel, indirect costs, and contracts) incurred by EPA and its contractors, and/or a similar summary of costs incurred by the Department of Justice Environment and Natural Resources Division and its contractors, on a periodic basis. Settling Defendants shall make all payments within 30 days of Settling Defendants' receipt of each bill requiring payment, except as otherwise provided in Subparagraph (d) of this Paragraph. The Settling Defendants shall make all payments required by this Paragraph in the form of a certified or cashier's check or checks made payable to "EPA Hazardous Substance Superfund" and referencing EPA Region and Site/Spill ID # 0117, Davis Liquid Waste Site Special Account, and DOJ case number 90-11-2-137B. The Settling Defendants shall send the check(s) to EPA Region I, Attention: Superfund Accounting, P.O. Box 360197M, Pittsburgh, PA 15251 and shall send copies of the check(s) to the United States as specified in Section XXVI (Notices and Submissions) and to Chief, Search and Cost Recovery Office, U.S. E.P.A. (HBS), J.F.K. Federal Building, Boston, Massachusetts 02203.

b. For purposes of the payments required to be made by Settling Defendants under Subparagraph (a) of this Paragraph only, Future Response Costs shall exclude costs of performing (including O & M) or overseeing the Management of Migration Components of the remedy set forth in the ROD.

c. Oversight Costs recoverable under Subparagraph (a) of this Paragraph shall be limited to the principal sum of $440,000 plus the amount of Oversight Costs incurred in connection with any one or more of the following portions of on-Site Work, as described in the SOW, taking longer than the amount of time indicated below:

| | |
|---|---|
| Pre-Design | 25 days of on-Site Work |
| Performance Testing | 10 days of on-Site Work |
| Excavation, Treatment, and Backfilling or Off-Site Disposal of Soil | 100 days of on-Site Work |
| Site Restoration | 40 days of on-Site Work |

For purposes of this Subparagraph, a "day of on-Site Work" shall mean any part of a day during which Work associated with any portion of the above activities, as described in the SOW, is performed at the Site. Reimbursement of Future Response Costs that are not Oversight Costs shall not be limited by this Subparagraph.

d. Settling Defendants may contest payment of any Future Response Costs under this Paragraph if they determine that the United States has made an accounting error or if they allege that a cost item that is included represents costs that are inconsistent with the NCP. Such objection shall be made in writing within 30 days of receipt of the bill and must be sent to the United States

from or related to (i) failure to comply with, or (ii) enforcement of rights under, separate agreements between the Settling Defendants with respect to the Site. The Settling Defendants agree that as between the Settling Defendants only, in the event that any inconsistency between this Consent Decree and any separate agreements between the Settling Defendants with respect to the Site, the separate agreements between the Settling Defendants shall govern.

XXIII. EFFECT OF SETTLEMENT; CONTRIBUTION PROTECTION

94. Nothing in this Consent Decree shall be construed to create any rights in, or grant any cause of action to, any person not a Party to this Consent Decree. The preceding sentence shall not be construed to waive or nullify any rights that any person not a signatory to this decree may have under applicable law. Except as provided in Paragraph 93, each of the Parties expressly reserves any and all rights (including, but not limited to, any right to contribution), defenses, claims, demands, and causes of action which each Party may have with respect to any matter, transaction, or occurrence relating in any way to the Site against any person not a Party hereto.

95. The Parties agree that the Settling Defendants are entitled, as of the effective date of this Consent Decree, to protection from contribution actions or claims as provided by CERCLA Section 113(f)(2), 42 U.S.C. § 9613(f)(2), for matters addressed in this Consent Decree. The matters addressed in this Consent Decree are all Past Response Costs and all Future Response

Costs, including Oversight Costs, incurred and to be incurred by the United States as defined in Section IV (Definitions), including such costs for which the United States has been reimbursed and, except as provided in Paragraphs 86 and 88 of this Consent Decree, Federal Costs of Assessment of Natural Resources Damages incurred by NOAA and Natural Resource Damages for Natural Resources under the trusteeship of NOAA. Matters addressed in this Consent Decree also are response costs incurred and to be incurred by any person or entity other than the United States for response actions related to the Site or identified in the remedy selected in the ROD as modified by the ESD.

96. The Settling Defendants agree that with respect to any suit or claim for contribution brought by them for matters related to this Consent Decree they will notify the United States in writing no later than 60 days prior to the initiation of such suit or claim.

97. The Settling Defendants also agree that with respect to any suit or claim for contribution brought against them for matters related to this Consent Decree they will notify in writing the United States within 10 days of service of the complaint on them. In addition, Settling Defendants shall notify the United States within 10 days of service or receipt of any Motion for Summary Judgment and within 10 days of receipt of any order from a court setting a case for trial.

98. In any subsequent administrative or judicial proceeding initiated by the United States for injunctive relief, recovery of

# EXHIBIT B

**Excerpts from**

**State of Rhode Island, Plaintiff**
**v.**
**United Technologies Corporation, et al., Defendants**

**Civil Action No. 97-138B**

**CONSENT DECREE**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

State of Rhode Island,

Plaintiff,

CA 97 138B

United Technologies Corporation, et al.

Defendants.

Civil Action No. ______

CONSENT DECREE

I. **Background**

A. This Consent Decree is entered into by the State of Rhode Island and Providence Plantations (the "State") and the entities listed in Appendix A ("Settling Defendants") in order to resolve potential liability for State claims concerning the Davis Liquid Site (the "Site") in Smithfield, Rhode Island, under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601, *et seq.*, the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. § 6901, *et seq.*, the Rhode Island Hazardous Waste Management Act, R.I. Gen. Laws §§ 23-19.1, 46-12, 46-13.1, 23-19.14, *et seq.*, and under common law.

B. The State, in its complaint, and in entering into this Consent Decree, seeks: (1) reimbursement of costs incurred by the State for past and future response actions at the Site, including oversight costs, together with accrued interest; (2) performance of studies and response work by the defendants at the Site consistent with the National Contingency Plan, 40 CFR Part

17206J

Settling Defendant including, but not limited to, any transfer of assets or real or personal property shall in no way alter such Settling Defendant's responsibilities under this Consent Decree.

## IV. Definitions

3. Unless otherwise expressly provided herein, terms used in this Consent Decree which are defined in CERCLA shall have the meaning assigned to them in CERCLA. Whenever terms listed below are used in this Consent Decree or in the appendices attached hereto and incorporated hereunder, the following definitions shall apply:

*Court* shall mean the United States District Court for the District of Rhode Island.

*Covered Matters* shall mean all of the State's claims, asserted or unasserted, accrued or unaccrued, in connection with the Site, including, without limitation, claims for the State's Future Response Costs, Past Response Costs, Enforcement Costs, Oversight Costs, Natural Resource Damages, and Interest on these obligations. The term also shall include Future Performance Costs, incurred by any person or entity, whether under the ROD for this Site, or under the SOW attached to the Federal Consent Decree as supplemented by the Remedial Design Work Plan attached to this Decree, or for the additional sampling, analysis, and groundwater modeling work provided for in this Decree in Paragraph 12. Covered Matters shall also include any State costs that are reimbursed by private parties. All of these claims are being compromised and resolved in return for the undertakings of the Settling Defendants as set forth in this Consent Decree.

*Day* shall mean a calendar day. In computing any period of time under this Consent Decree, where the last day would fall on a Saturday, Sunday, or Federal holiday, the period shall run until the close of business of the next working day.

*Enforcement Costs* shall mean any costs that the State has paid in the past or may incur and pay in the future with regard to litigation concerning the Site. Enforcement costs include, but are not limited to, legal fees for attorneys and legal assistants employed by the Rhode Island Department of Environmental Management and the Rhode Island Attorney General's Office, reasonable fees of any independent counsel hired by the State, costs of travel and investigation associated with enforcement, document production costs, and court costs.

*Federal Consent Decree* shall mean the separate Consent Decree between the United States and many of the Settling Defendants as defined in *United States v. Davis, et al.*, Civil Action No. 90-0484-P, which Federal Consent Decree provides for, among other things, the performance of the soil cleanup work at the Davis Liquid Waste Site.

*Future Response Costs* shall mean costs the State incurs and pays with regard to the Site after the effective date of this Consent Decree as defined in Paragraph 21, including, but not limited to, oversight costs as defined herein, costs incurred in reviewing or developing plans, reports and other items pursuant to this Decree, verifying the performance of the remediation work by Settling Defendants, or otherwise implementing, or overseeing, the work to be performed under this Consent Decree. Future Response Costs include, but are not limited to, payroll costs, contractor costs, travel costs, laboratory costs, and any indirect costs or overhead. Future Response Costs expressly include costs the State incurs to design, construct, operate, or maintain any groundwater treatment remedy and the water line provided in the ROD.

*Future Performance Costs* shall mean costs incurred by the Settling Defendants or any other person or entity to perform the work provided for in the ROD (including groundwater treatment and water line installation), as well as the work provided in the SOW to the Federal Consent Decree as supplemented by the Remedial Design Work Plan attached to this Consent

Decree, and to conduct the sampling, analysis, and groundwater modeling work provided for at Paragraph 12 in this Consent Decree, as well as any other performance costs which the State compels any person or entity to incur for performance of work at the Site.

*Interest* shall mean interest at the rate specified for interest on investments of the Hazardous Substance Superfund established under Subchapter A of Chapter 98 of Title 26 of the U.S. Code, and in accordance with 42 U.S.C. § 9607(a).

*Oversight Costs* shall mean costs incurred by the State in reviewing plans, reports, and other items pursuant to this Consent Decree, verifying the work, or in otherwise overseeing this Consent Decree, including, but not limited to, payroll costs, contractor costs, travel costs, and laboratory costs, and any indirect costs or overhead.

*Remedial Design Work Plan* shall mean the work plan attached to this Consent Decree as Appendix B. If work under the Remedial Design Work Plan cannot be performed because of later contrary requirements imposed under the Federal Consent Decree, that conflict shall constitute an event of force majeure excusing Settling Defendants' performance of the conflicting requirement to the extent such conflict cannot be resolved through good faith consultation among the parties to this Consent Decree and the United States.

*National Contingency Plan* or "NCP" shall mean the National Oil and Hazardous Substances Pollution Contingency Plan promulgated pursuant to section 105 of CERCLA, 42 U.S.C. § 9605, codified at 40 CFR part 300, including, but not limited to, any amendments thereto.

*Natural Resource Damages* shall mean damages for injury, destruction, or loss of use of State natural resources caused by conditions at the Site, including, but not limited to, groundwater and wetlands resources of the State.

172063

*Paragraph* shall mean a portion of this Consent Decree identified by an Arabic numeral or an upper case letter.

*Parties* shall mean the State of Rhode Island and the Settling Defendants, and "*Party*" shall mean any one of these Parties.

*Past Response Costs* shall mean costs, including, but not limited to, that incurred or paid with regard to the Site prior to and including the date on which the Court enters this Consent Decree. This term shall include, but not be limited to, all costs incurred by the State, regardless of whether such costs are paid from the State's Environmental Response Fund, R.I. Gen. Laws §§ 23-19.1-23 or from other funding sources or otherwise, for the Management of Migration Components of the Remedy as defined in the Record of Decision (ROD), including costs for the design, construction, operation, maintenance or oversight of the water line, appurtenant water supply equipment, and any land acquisition, access, or legal costs incurred in connection with the water line. The term shall also include any costs the State has incurred with respect to the design or construction of any groundwater treatment system at the Site, including any monitoring, sampling, analysis, design, or engineering work for the design, construction or testing of any such system. The term shall also include all costs incurred in connection with any litigation against the Site owners, including all costs associated with the management or removal of tires.

*RCRA* shall mean the Solid Waste Disposal Act, as amended, 42 U.S.C. 6901 *et seq.* (also known as the Resource Conservation and Recovery Act).

*RIDEM* shall mean the Rhode Island Department of Environmental Management and any successor departments or agencies of the State.

*Settling Defendants* shall mean those entities identified in Appendix A.

*Site* shall mean the Davis Liquid Site, located in Smithfield, Rhode Island.

*State* shall mean the State of Rhode Island and Providence Plantations.

*Statement of Work* or *"SOW"* shall mean the Statement of Work for implementation of the remedy at the Site, as set forth in an Appendix to the Federal Consent Decree, and any modifications made in accordance with the Federal Consent Decree.

*Waste Material* shall mean (1) any "hazardous substance" under § 101(14) of CERCLA, 42 U.S.C. § 9601(14); (2) any pollutant or contaminant under § 101(33) of CERCLA, 42 U.S.C. § 9601 (33); (3) any "solid waste" under § 1004(27) of RCRA, 42 U.S.C. § 6903(27); and (4) any "hazardous material" under the Rhode Island Hazardous Waste Management Act, R.I. Gen. Laws §§ 23-19.1 and 23-19.14.

V. **General Provisions**

4. Objectives of the Parties

The objectives of the Parties in entering into this Consent Decree are to protect public health and welfare and the environment at the Site by facilitating the design and implementation of response actions at the Site by the Settling Defendants, to compensate the State for injury to, destruction of, or loss of natural resources of the State, to reimburse past response costs of the State, and to compensate the State for expected future response costs related to the Site.

5. Commitments by Settling Defendants

A. Settling Defendants shall reimburse the State for Past Response Costs, Future Response Costs, Enforcement Costs, Oversight Costs, Interest, and for State Natural Resources Damages as provided in Section IX of this Consent Decree.

B. The obligations of Settling Defendants to pay amounts owed the State under this Consent Decree are joint and several. In the event of the insolvency or other failure of any one

172063

under this provision, Settling Defendants shall reimburse the State for its reasonable costs and attorney's fees for such effort.

G. Dispute Resolution. Any dispute which arises under or with respect to this Consent Decree shall in the first instance be the subject of informal negotiations between the Parties to the dispute. The period for informal negotiations shall not exceed 20 days from the time the dispute arises, unless it is modified by written agreement of the Parties to the dispute. The dispute shall be considered to have arisen when one Party sends the other Parties a written Notice of Dispute.

H. In the event that the Parties cannot resolve a dispute by informal negotiations, then the position advanced by the State shall be considered binding, unless within 21 days after the conclusion of the information negotiation period, the Settling Defendants file with the Court and serve on the Parties a motion for judicial review of the matter. The State may file a response to such motion within 21 days of service.

VI. **Covenants by State**

7. In consideration of the payment that will be made by the Settling Defendants under the terms of the Consent Decree, the performance to be undertaken pursuant to the Federal Consent Decree, as supplemented by the Remedial Design Work Plan attached to this Consent Decree (including construction of the concrete pad described in that plan), and the additional sampling, analysis and modeling work specified in Paragraph 12 of this Consent Decree (except as specifically provided in Paragraphs 9 and 10), the State covenants not to sue Settling Defendants for Covered Matters pursuant to Sections 106, 107, 113, or 310 of CERCLA, RCRA, the Rhode Island Hazardous Waste Management Act, or pursuant to any other Federal or State statute or common law, or to seek to compel or to complete any performance at the site beyond that

{72063}

provided in the Federal Consent Decree, the Remedial Design Work Plan attached to this Consent Decree, or Paragraph 12 of this Consent Decree. The covenants not to sue in this Paragraph shall take effect upon the receipt by the State of the payment required by Section IX. These covenants not to sue are conditioned upon the satisfactory performance by Settling Defendants of their remedial obligations under this Consent Decree. "Satisfactory Performance" for purposes of this Paragraph shall mean federal certification of completion of construction of the work as provided in the SOW and issuance by the State of a letter of compliance concerning completion of the concrete pad and program of groundwater sampling, analysis, and modeling provided for in this Consent Decree. These covenants not to sue extend only to the Settling Defendants and do not extend to any other person. Nothing herein shall bar any claims for response costs or injunctive relief that the United States itself may otherwise pursue directly against the Settling Defendants.

8. Effective upon the receipt by the State of the payment required by Section IX, the State releases the Settling Defendants from all claims, suits, damages, losses, liabilities, obligations, costs and expenses of any kind whatsoever now existing or accrued or which may hereafter accrue or exist, arising from or on account of the alleged contamination at the Site.

9. State's reservations. Notwithstanding any other provision of this Consent Decree, the State reserves, and this Consent Decree is without prejudice to, the right to institute proceedings in this action or in a new action seeking to compel Settling Defendants to perform certain ground water sampling and analysis work as required under Section VIII should Settling Defendants fail to satisfy the requirements of such section, or to carry out their obligations under the Consent Decree with the United States, as supplemented by the Remedial Design Work Plan attached to this Consent Decree.

Consent Decree governing performance of the soils remediation by the Settling Defendants has been approved and entered by the Court.

## VIII. Additional Ground Water Sampling, Analysis, and Modeling

12. The Parties agree that at the conclusion of the soils remediation work at the Site and in coordination with the appropriate State personnel, the Settling Defendants will conduct two rounds of ground water sampling and analysis, as well as ground water modeling work, all as specified in writing by the State at the conclusion of the soils remediation work. Such sampling, analysis, and modeling work is to be performed at the cost of the Settling Defendants, except that the total cost to Settling Defendants of this work shall not exceed $200,000.00, which amount shall fully satisfy Settling Defendants' obligations under this Paragraph.

## IX. Reimbursement of Costs for Covered Matters

13. Within 45 days of the later of the dates on which the Court enters this Consent Decree or the Federal Consent Decree, Settling Defendants shall pay to the State $2,070,000, in the form of a certified check or checks made payable to "General Treasurer, State of Rhode Island," and referencing "Davis Consent Decree" for deposit in the State's Environmental Response Fund, R.I. Gen. Laws, §23-19.1-23, or for deposit to such other State accounts as instructed in writing by counsel for the State, which instructions shall be filed with the Court, or for application to such Supplemental Environmental Projects as may be mutually agreed upon in writing. .

When the $2,070,000 payment is received by the Department of Environmental Management (DEM), the DEM shall deposit the monies in the Environmental Response Fund as indicated above. Of said monies, they shall be encumbered and apportioned according to lawful State procedures and regulatory requirements for the following purposes:

1. State cost share obligations to EPA for the Davis Liquid Waste Alternative Water

sum of $2,070,000 into an escrow account providing for payment as instructed by the State's counsel upon the expiration of all appeals if the appeals are unsuccessful, or in the event the Consent Decree is disapproved on appeal or remanded to the District Court for modification, repayment to the Settling Defendants according to instructions provided on their behalf to the State at the time the escrow account is established. In lieu of the interest provided in ¶ 14.a., the State shall be entitled to the actual interest earned on the escrowed amount if the appeals are unsuccessful; the interest earned on the escrowed amounts shall be returned to Settling Defendants if the Consent Decree is disapproved on appeal or if the Consent Decree is remanded to the District Court for modification.

X. **Covenants by Settling Defendants**

15. Settling Defendants hereby covenant not to sue and agree not to assert any claims or causes of action against the State with respect to the Site or this Consent Decree. However, the Settling Defendants reserve, and this Consent Decree is without prejudice to, actions against the State based on negligent actions taken directly by the State (not including oversight or approval of the Settling Defendants' plans or activities or any claim for negligent regulation or failure to regulate the activities giving rise to conditions at the Site as of the date of lodging) that are brought pursuant to any statute other than CERCLA and for which the waiver of sovereign immunity is found in a statute other than CERCLA.

XI. **Effect of Settlement; Contribution Protection**

16. Nothing in this Consent Decree shall be construed to create any rights in, or grant any cause of action to, any person not a Party to this Consent Decree. The preceding sentence shall not be construed to waive or nullify any rights that any person not a signatory to this decree may have under applicable law. Each of the Parties expressly reserves any and all rights (including,

172063

but not limited to, any right to contribution), defenses, claims, demands, and causes of action which each Party may have with respect to any matter, transaction, or occurrence relating in any way to the Site against any person not a Party hereto.

17. The Parties agree, and by entering this Consent Decree this Court finds, that the Settling Defendants are entitled, as of the effective date of this Consent Decree, to protection from contribution actions or claims as provided by CERCLA Section 113(f)(2), 42 U.S.C. § 9613(f)(2) for Covered Matters, and as provided by Rhode Island General Laws § 23-19.14 for Covered Matters. For purposes of this Paragraph, the term "Covered Matters" is to be construed to provide contribution protection against claims by the State or any other person (except the United States) for all matters relating to the Site. As provided in Paragraph 3 and as used in this Decree, "Covered Matters" includes, without limitation, all removal and/or remedial actions called for by the ROD, the Explanation of Significant Differences (ESD), and any amendments thereto, the Federal Consent Decree, its Appendices, and any amendments thereto, this Consent Decree, its Appendices, and any amendments thereto, the recovery of any unaddressed Past and/or Future Response Costs, Future Performance Costs, Oversight Costs, Enforcement Costs, Natural Resource Damages, and the Interest thereon. As used in this Decree, "Covered Matters" also expressly includes but is not limited to, the soil remediation work provided for in the ROD, as modified by the ESD, and supplemented by the Remedial Design Work Plan attached to the Decree, as well as the groundwater treatment work and alternate water supply provided for in the ROD, as that ROD may be modified from time to time, and the groundwater sampling, analysis and modeling work set forth in this Consent Decree.

requirements set forth in Rule 4 of the Federal Rules of Civil Procedure and any applicable local rules of this Court, including, but not limited to, service of a summons.

So ordered this 17th day of [illegible], 19[illegible].

Ernest C. Torres

United States District Judge

**EXHIBIT C**

**Sheridan Declaration**

IN THE UNITED STATES DISTRICT COURT FOR
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| Ashland Inc.<br><br>Plaintiff,<br>v.<br><br>GAR Electroforming, et al.<br><br>Defendants. | Docket No. 08-227T |

**DECLARATION OF PHILIP W. SHERIDAN**

1. I am over 21 years of age and make this declaration in order to set forth certain facts for the Court in this action.

2. I am an employee of United Technologies Corporation (UTC) and have been employed by UTC as an engineer since 2000. As part of my responsibilities, I have worked on environmental remediation matters for UTC since 1996, including the remediation at the Davis Liquid Superfund Site in Smithfield, Rhode Island.

3. As part of my employment, I assisted in supervising the completion of the soil cleanup remedy required by the federal Environmental Protection Agency (EPA) and the Rhode Island Department of Environmental Management (RIDEM) as part of consent decrees UTC entered in connection with the settlement by UTC of EPA and RIDEM claims concerning the Davis Liquid Superfund Site.

4. In May 2002, UTC filed a report with EPA, detailing the completion of the work at the Davis Liquid Superfund Site. I had participated in the preparation of this report. Among other things, this report certified that UTC has spent approximately $23,950,000 in site remediation costs in carrying out UTC's work at the Davis Liquid Superfund Site.

5. In February 2003, UTC paid EPA's oversight cost bill for the Davis site. UTC's cords show that UTC paid $408,753.68 in check number 338955 dated February 12, 2003.

6. I participated in inspections with EPA and RIDEM of the Davis Liquid Superfund te in order to determine if the soil remedial work required in the settlement had been properly ompleted. In July 2004, EPA issued the certification letter to UTC that UTC had satisfactorily ompleted the remedial work required under the settlement. I personally reviewed that letter.

7. To my knowledge, Ashland has never paid UTC anything for the soil remediation ork UTC conducted at the Davis Liquid Superfund Site.

ursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and orrect.

Philip W. Sheridan

hilip W. Sheridan

ugust 12, 2008

Hartford, Connecticut

# EXHIBIT D

## Superfund Interest Rates

# Superfund Interest Rates

## 1980 to Present

| FISCAL YEAR | RATE | INSTRUMENT |
|---|---|---|
| 2008 | 4.34% | MK-Note |
| 2007 | 5.02% | MK-Note |
| 2006 | 4.11% | MK-Note |
| 2005 | 2.21% | MK-Note |
| 2004 | 1.27% | MK-Note |
| 2003 | 1.47% | MK-Note |
| 2002 | 3.35% | MK-Note |
| 2001 | 6.18% | MK-Bill |
| 2000 | 5.30% | MK-Bill |
| 1999 | 4.53% | MK-Bill |
| 1998 | 5.61% | MK-Bill |
| 1997 | 5.69% | MK-Bill |
| 1996 | 5.86% | MK-Bill |
| 1995 | 5.63% | MK-Bill |
| 1994 | 3.36% | MK-Bill |
| 1993 | 3.49% | MK-Bill |
| 1992 | 5.70% | MK-Bill |
| 1991 | 7.99% | MK-Bill |
| 1990 | 8.47% | MK-Bill |
| 1989 | 8.39% | MK-Bill |
| 1988 | 6.99% | MK-Bill |
| 1987 | 5.63% | MK-Bill |
| 1986 | 7.43% | MK-Bill |
| 1985 | 10.82% | MK-Bill |
| 1984 | 9.40% | MK-Bill |
| 1983 | 11.32% | T-Bill |
| 1982 | 17.26% | T-Bill |
| 1981 | 10.93% | T-Bill |
| 1980 | 10.88% | T-Bill |